## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| REECON NORTH AMERICA, LLC, | ) | |
| | ) | |
| **Plaintiff,** | ) | **2:18-CV-00234-JFC** |
| vs. | ) | |
| | ) | |
| DU-HOPE INTERNATIONAL GROUP, | ) | |
| REECON M & E CO. LTD., | ) | |
| | ) | |
| **Defendants.** | ) | |

| | | |
|---|---|---|
| REECON M & E CO. LTD., GUOHONG | ) | |
| FU, YAODANG WANG, and DU-HOPE | ) | |
| INTERNATIONAL GROUP, | ) | **2:18-CV-00631-JFC** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| REECON NORTH AMERICA, LLC, and | ) | |
| DAVID BRAND, | ) | |
| | ) | |
| **Defendants.** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The court has a nondelegable duty to ensure that it may properly exercise subject-matter jurisdiction over these related cases. On May 30, 2018, the court issued an order for Reecon North America, LLC ("Reecon NA"), formerly named Brand Marketing Group, LLC ("BMG")[1] and David Brand ("Brand") (collectively, the "Brand Parites") to show cause why Civil Action No. 18-234 should not be dismissed and Civil Action No. 18-631 remanded to the state court for lack of subject-matter jurisdiction. The parties engaged in extensive jurisdictional discovery; the court held an evidentiary hearing on December 18, 2018; Chinese citizens Guohong Fu ("Fu")

---

[1] BMG changed its name to Reecon North America, LLC on February 11, 2015, but is the same business entity. Ex. R. To avoid confusion, the entity will be referred to in this opinion as BMG, except where the context requires a reference to Reecon NA.

and Yaodang Wang ("Wang"), and Chinese corporations Reecon M & E Co., Ltd. ("Reecon M&E") and Du-Hope International Group ("Du-Hope") (collectively, the "Reecon Parties") renewed their motion to dismiss for lack of jurisdiction (ECF No. 59)[2]; and the parties filed post-hearing proposed findings of fact and conclusions of law. Also pending are the Brand Parties' objections to certain evidence (ECF No. 69). The matters are now ripe for disposition.

## FINDINGS OF FACT

### A.     The Parties

1.     Brand formed BMG as a limited liability company ("LLC") under Delaware law on November 15, 2004. Ex. 12 ("LLC Agreement," attached to Answer and New Matter).[3] BMG's business was the sale of space heaters under the trade name of "Thermablaster."

2.     Brand initially was the sole member of BMG. Brand is a citizen of Pennsylvania.

3.     The LLC Agreement in § 6 provided: "The LLC shall be authorized to issue a single class of Limited Liability Company Interest (as defined in the Act) (the "Interest") including any and all benefits to which the hold of such Interest may be entitled in this Agreement, together with all obligations of such person to comply with the terms and provisions of this Agreement." Ex. 12.

4.     The LLC Agreement contemplated that two or more persons or entities could hold membership interests in the LLC. Ex. 12 § 8.

5.     The LLC Agreement in § 11 provided: "The Member may assign all or any part of its Interest at any time (an assignee of such Interest is hereinafter referred to as a

---

[2] Unless otherwise noted, all ECF citations are at Civil No. 18-234.
[3] The articles of organization were not provided to the court.

"Permitted Transferee"). A Permitted Transferee shall become a substituted Member automatically upon an assignment." Ex. 12.

6.        Fu has owned and been managing director of Reecon M&E since 2004. Fu Deposition at 12, 14. Its business is the manufacture of heaters. Fu is a Chinese citizen.

7.        Wang is the deputy general manager of Du-Hope. Wang Deposition at 8. Wang is a Chinese citizen.

8.        Reecon M&E and Du-Hope are Chinese companies.

## B.       The Export Agency Arrangement

9.        On March 15, 2009 (before entry into any relationship with the Brand Parties), Reecon M&E and Du-Hope entered into an "export agency" agreement. Ex. 17. Du-Hope's duties as export agent included issuing invoices, packing lists and other needed documents in exchange for a 3% commission. *Id*. On behalf of Reecon M&E, Du-Hope signed the documentation with designated foreign companies. Fu Deposition at 149.

10.       Brand's testimony that he did not know Du-Hope's role was as an export agent for Reecon M&E is not credible, for several reasons.

       a.       Fu testified credibly that at the very beginning of the relationship, he told Brand that Du-Hope was Reecon M&E's export agent and gave him a copy of the export agency agreement. Fu Deposition at 148.

       b.       The merger negotiations (described below) were conducted between Brand and Fu, with no participation by Du-Hope.

       c.       Brand testified that he had almost no interactions with Wang. Tr. 72, 142.

d.     John Sherman ("Sherman") testified credibly that Brand was the person who explained to him that Du-Hope was Reecon M&E's export agent. Sherman Deposition at 33, 64. Sherman has known Brand since 2008, served as a sales representative for BMG, and talked extensively with Brand about all aspects of BMG's business. Sherman Deposition at 8-9.

e.     In the complaint in *BMG v. Intertek Testing Services NA, Inc.. et al.,* Civil Action No. 12-1572 (W.D. Pa.) (the "Intertek lawsuit"), BMG averred that it "contracted with a Chinese company, Reecon M & E Co. Ltd., ("Reecon") and its owner Guohong Fu ("Fu"), to manufacture the heaters for large-scale distribution." Ex. 53 (Complaint ¶ 16).

11.     Brand and BMG knew that Fu and Reecon M&E (not Du-Hope) were the real business contacts for BMG. The court rejects the Brand Parties' proposed findings of fact that Du-Hope took the lead in the transactions, and that BMG ordered the heaters directly from Du-Hope.

12.     Du-Hope's role as export agent for Reecon M&E did not change throughout the relevant time period. In September 2016, Brand sent an email to Chen at Du-Hope, urgently asking him to meet with Fu about moving a shipment time up to avoid a penalty. Chen responded: "Once again, Du-Hope is just the export agent of Reecon [M&E]. We are not responsible for any issues like quality and shipment schedule. Brand responded: "I understand that you are not responsible for quality issues and late shipments . . . ." Ex. 37.

13.     In summary, the business transactions leading up to the disputes in these cases were negotiated between Brand on behalf of BMG and Fu on behalf of Reecon M&E. Du-Hope signed the paperwork in its capacity as the export agent for Reecon M&E. Fu Deposition at 22-24.

## C. The Merger Negotiations

14.     Brand and Fu were first introduced to each other in 2008 or 2009 by John

Neumann ("Neumann") and John Norman, who worked for Winners Shanghai.  Also

at their first meeting was an individual from Du-Hope, the export agent.[4]  Fu

Deposition at 16-18.

15.     In 2011, BMG began purchasing heaters from Reecon M&E.  Fu Deposition at

23.

16.     In 2012, Brand proposed a merger of BMG and Reecon M&E.

17.     On November 15, 2012, Brand sent an email to "Fu Reecon" attaching a cash

flow projection and inquiring whether he could have an attorney begin drafting an

agreement.  Ex. 30.

18.     Brand also sent Fu a document entitled "BMG-Reecon Merger Proposal –

Updates 11-15-12."  Ex. 1.   In the document, Brand outlined a proposal by which he

would issue 25% of "BMG Company stock"[5] to Reecon M&E in exchange for an

investment of $185,129.75 ($50,000 in cash and $135,129.75 in product, of which

$15,129.75 had already been provided) and BMG would change its name to "Reecon

USA, L.L.C." while keeping the existing corporate structure in the United States.

The stated purpose was:  "To join the two companies together and make a more

powerful company in the market place in both the US and China."  *Id*.

---

[4] The Brand Parties' citation of Neumann Deposition 55:9-18 for the proposition that Winners Shanghai introduced Brand to Du-Hope is misleading.  (ECF No. 67 at 6).  On the same page of Neumann's deposition he explained that he did not know if they introduced Brand to Du-Hope or Reecon M&E.  Neumann Deposition at 55:19-23.
[5] Brand did not make a legal distinction between the transfer of "stock" and the transfer of membership interests in a LLC.

19.     The parties negotiated revisions.  One issue was whether the membership interests

should be owned by Fu and Wang as individuals, rather than Reecon M&E, because

China controls all flow of foreign exchange.  Ex. 2.

20.     On December 29, 2012, Fu sent a letter with twelve points.  Among other items,

Fu proposed that Reecon M&E's product investment payment be completed by the

end of July 2013.  Ex. 2.

21.     Fu recognized that Brand would own "75% of the share, therefore you can orient

and decide all the normal activities of the new company."  Ex. 2.

22.     During the negotiations, Fu recognized that Brand "as the managing director, can

decide all the operational activities, including the profit allocation, for example, if

you think it's better to take the profit as new investment."  Ex. 2.

23.     Brand responded by email that typically 25% owners would be responsible for

25% of the federal tax, but "I have agreed to keep the profit and pay 100% of the tax

each year going forward."  Ex. 2.

24.     In an email on December 31, 2012, Brand explained that the draft agreement he

sent to Fu "was written based on the merger talking points that I attached."  Ex. 2.

25.     On January 14, 2013, Brand sent Fu an email entitled "Membership Interest

Purchase Agreement."[6]  Ex. 2.  In response to questions from Fu, Brand (1) agreed

that major decisions should be discussed and approved by all members; and (2)

explained:   "The operating agreement will come later after the transaction is

complete.  The operating agreement is between the company and the state of

---

[6] The effort by counsel for the Brand Parties to characterize the parties' eventual contract as a "Supply Agreement," (ECF No. 67 at 8) is disingenuous.  It is clear from the context that the primary purpose for both sides was the issuance of membership interests to Fu and Wang.

Delaware, and determines how the company will conduct business.  One is in place, but will be revised to include Wang and Fu."  Ex. 2.

26.    On January 20, 2014, Brand sent an email to Jon Sherman ("Sherman"), his sales representative, stating:  "The merger is the same one that has been in progress since early 2012.  As you recall I have a deal with Fu for some cas[h] and prod[uct] in exchange for stock." [7]  Ex. 5.

27.    On January 22, 2013, Brand sent an email attaching a final draft of "the new membership purchase agreement," which included Fu's requested changes.  Ex. 13.  The Membership Agreement is more fully described in part D below.  Attached as an exhibit to the Membership Agreement in the email was an amended operating agreement, which is described more fully in part E below.   Ex. 13.

### D.    The Membership Agreement

28.    On January 31, 2013, BMG, Reecon M&E, Fu and Wang formally executed the Membership Purchase and Supply Agreement ("Membership Agreement").  Ex. 4.  Brand signed the agreement on behalf of BMG.  Fu signed on behalf of Reecon M&E.

29.    As relevant to the jurisdictional issues in dispute, the Membership Agreement provided that in consideration of a cash investment by Fu and Wang of $50,000 and an investment of $135,129.75 in product by Reecon M&E, BMG agreed to issue Fu and Wang each a 12.5% interest in BMG "as of the date hereof, subject to the terms and conditions stated herein."  Section 1.1(a) provided that on or before the closing, BMG would adopt an amended operating agreement in the form attached as exhibit A to the agreement.  Section 1.1(b) provided that the issuance of the membership

---

[7] Brand did not make legal distinctions between a "merger," "stock" or issuance or transfer of membership interests in a LLC.

interests would occur "at the Closing." *See also* Section 2.3 ("At the Closing, subject to the terms and conditions hereof, the Company shall sell and transfer the Interests to each Principal."). Section 2.1 provided that the closing would take place remotely via the exchange of documents and signatures within 10 business days following the satisfaction of the conditions set forth in "Section 5"[8], or at such other time and place as mutually agreed upon orally or in writing.

30.     Section 6.1 set four conditions to closing: (a) payment of the cash purchase price and delivery as directed by BMG of products in the full amount of the product purchase price; (b) the representations and warranties in Sections 4 and 5 remained true; (c) performance of all agreements and conditions for closing; and (d) the "Operating Agreement substantially in the form attached hereto as Exhibit A shall have been executed and delivered by the parties thereto including Reecon [M&E]."

31.     In Section 7.1, Reecon M&E appointed BMG as a distributor of Reecon M&E's products and granted BMG the exclusive right to distribute and sell products in North America. "Following the Closing Date," BMG and Reecon M&E agreed to negotiate a supply arrangement. *Id.*

32.     Pursuant to Section 7.2, BMG would change its name to "Reecon USA, LLC" or, if that name was not available, an alternative name. Each party could hold itself out to the public as being affiliated with the other. Section 7.3 required commercially reasonable efforts to cooperate. Section 7.4 contemplated an annual meeting, to be held in accordance with the amended operating agreement.

33.     Section 8.2(b) gave BMG authority to terminate the Membership Agreement by written notice if: (i) Reecon M&E, Fu or Wang breached any representation, warranty

---

[8] Section 6 of the Membership Agreement sets forth the conditions to closing. The reference to Section 5 appears to be a typographical error.

or covenant (subject to notice and a 30-day cure period); or (ii) if the Closing did not occur by December 31, 2013, "by reason of the failure of any condition precedent under Section 6 hereof (unless the failure results primarily from the Company itself breaching any representation, warranty, or covenant in this Agreement)."

34.     The Membership Agreement is governed by Delaware law.  Section 9.1.

35.     On February 27, 2013, Brand sent Fu an email purporting to attach the "complete version of the agreement for yours and Wang's records."  Ex. 4.  Exhibit A (Amended Operating Agreement) and exhibit B (Product Contribution) were not attached to the "complete version" sent by Brand.

### E.     The Amended Operating Agreement

36.     The exhibit attached to the Membership Agreement in Brand's January 22, 2013 email was captioned Amended and Restated Agreement of Limited Liability Company (the "Amended Operating Agreement").  Ex. 13.

37.     The document was labeled "EXECUTION VERSION."

38.     The recitals noted that the Amended Operating Agreement was being amended "[i]n connection with the admission of 2 new individuals to the Company as Members on the date hereof."

39.     Section 3.01 stated "The Members of the Company are the Persons listed on Annex A."  Annex A reflected that Brand owned 75%, Fu 12.5% and Wang 12.5% of BMG.  Ex. 13.

40.     Section 6.01 provided that Brand was the initial manager of the company, with exclusive responsibility to manage the business.

41.     The Amended Operating Agreement contained a blank signature page.

42.     Brand specifically instructed Fu and Want to not execute the Amended Operating Agreement in the January 22, 2013 email, stating:  "The attached operating agreement

is just for your reference and NOT to be signed at this time.  We will sign and file this after the final transaction of goods."  Ex. 13 (emphasis in original).

43.  The Amended Operating Agreement was never executed by Wang and Fu.

44.  The court rejects Brand's contention that Fu and Wang "abandoned" the Amended Operating Agreement (ECF No. 67 at 22).

### F.  Course of Dealing

45.  After the Membership Agreement was executed, the Brand Parties treated Fu and Wang as members of BMG.

46.  Sherman testified credibly that Brand discussed with regularity that Fu and Wang were owners of BMG.   Sherman Deposition at 7-9, 45.

47.  On March 13, 2013, Brand sent Sherman an email stating:  "I owe it to Fu and Wang as their money is now in this."  Ex. 15.

48.  Neumann is self-employed and works to help international companies develop business.  Neumann Deposition at 5.  Neumann testified that he developed a mentor relationship in which Brand confided in him about BMG's business.  Neumann Deposition at 15-16.

49.  Brand told Neumann that the transaction had happened and Fu and Wang had actually paid the money and paid the product investment.  Neumann Deposition at 22-23.  At a breakfast meeting in Greenville, S.C., Brand acknowledged Fu's and Wang's ownership in BMG.  Neumann Deposition at 26, 32-33.

50.  Neumann testified credibly at his deposition:  "I know the reason I am here.  It has to do with ownership.  Yes, I was told many times that, yes, there was a deal.  Yes, they were owners."  Neumann Deposition at 37.

51.  Frank Bernard ("Bernard") worked as a sales representative for BMG from 2014-2017.  Bernard Deposition at 7.  Bernard testified that he discussed Fu's and Wang's

ownership of BMG with Brand half a dozen times. Bernard Deposition at 13. Bernard explained that he had conversations with Brand about Fu and Wang providing cash and product investments in the company and that the name was changed from BMG to Reecon North America LLC as part of the transition to joint ownership. Bernard Deposition at 10-11. Bernard described an evening with Brand, Fu and Sherman in Nanjing, China, where Fu bought Johnny Walker Blue to celebrate the organization as a single entity between Fu and Brand. Bernard Deposition at 13-14.

52.     On July 29, 2013, Brand sent a letter on BMG letterhead to the US Consulate in Shanghai to seek a visa for Fu's trip to the United States. The letter referred to Fu as the managing director of Reecon M&E and "also a shareholder of our company." Brand signed and printed his name on the letter. Ex. 16.

53.     On February 11, 2015, BMG changed its name to "Reecon North America, LLC" as contemplated by § 7.2 of the Membership Agreement.

54.     On July 5, 2015, Brand sent Fu an email attaching a "Product Investment Worksheet." Ex. 9. The worksheet reflected that based on various shipments in 2014, the Reecon Parties more than satisfied their product investment condition, by providing $17,518.10 more product than required.

55.     The Reecon Parties satisfied the product investment condition of the Membership Agreement. It is undisputed that Fu and Wang paid the cash price.

56.     Neither Brand nor BMG ever invoked § 8.2(b) of the Membership Agreement, which authorized BMG to terminate the Membership Agreement if the conditions precedent were not met or the closing did not occur by December 31, 2013. *See* Ex. 4 § 8.2.

## G.    Product Problems

57.    At Brand's direction, products used to satisfy the initial product investment were sent to Stoll Sales ("Stoll"), Grainger and Northern Tool.  Ex. 9; Tr. 50.

58.    The evidence presented at the hearing did not reflect how many of each specific heater model were provided to each customer.

59.    There is no evidence that Brand ever informed Fu, Wang or Reecon M&E that a defective product would be retroactively deducted from the initial product investment in BMG.

60.    On January 10, 2014, Brand sent Fu an email notifying him that heaters provided to Stoll had an ignition problem and sought a corrective solution.  Ex. U.  On February 10, 2014, Brand sent another email stating that Stoll had 120 25K infrared heaters that Stoll did not feel comfortable selling.  Ex. V.

61.    Brand and Fu exchanged numerous emails over the next several months about possible solutions.  Ex. YY.  On April 29, 2014, Brand sent an email explaining that Stoll was not happy with the proposed fix for the 25K heater, and thought that the 32K heater had declined in quality.  Ex. YY.

62.    In August 2014, Fu and Brand exchanged more emails about resolving the Stoll issue with the 120 25K heaters.

63.    It is unclear from the record whether the heaters were actually defective or simply failed to live up to Stoll's expectations based on the design.  A dual-fuel heater with a ceramic burner to generate more infrared waves will take longer to ignite.  Ex. V.

64.    Eventually, in July 2015, Brand sent 92 heaters from BMG's warehouse to Stoll. Tr. 57; Ex. X.

65. Some of the products returned from Stoll were used for samples and research; some were destroyed in the field; and some were sent to a company called Tarantin, which also rejected them. Tr. 58. No specific accounting was provided.

66. The record does not reflect what portion of the initial product investment was comprised of allegedly malfunctioning products.

67. Brand was aware of the Stoll product defects prior to his creation of the Product Investment worksheet he sent to Fu on July 5, 2015. Brand did not include a deduction for defects on that worksheet. Ex. 9.

68. BMG provided a credit of $4,100 for products returned by Northern Tool, although there is no evidence that those products were defective. Fu Deposition at 93.

69. The Brand Parties presented no evidence about product returns from Grainger.

70. Brand was willing to consider a shipment to Lowe's for product displays to be part of the Product Investment. Tr. 66.

71. In August 2016, Brand was willing to consider the Product Investment to be complete. Tr. 66. No formal written document was prepared, as contemplated by exhibit B to the Membership Agreement. Tr. 67-68.

72. In December 2016, BMG lost all its business with Lowe's. Tr. 47.

### H.    The Cooperation Agreement

73. On July 9, 2015, BMG, Reecon M&E and Du-Hope entered into a cooperation agreement (the "Cooperation Agreement"). Ex. 20. The purpose of the Cooperation Agreement was to extend cooperation on heater sales in North America. The Cooperation Agreement had a one-year term.

74. The Cooperation Agreement was entered pursuant to Section 7.1 of the Membership Agreement, Tr. at 106, which provided for good faith negotiation of a

supply agreement "following the Closing Date" of the Membership Agreement. Ex. 4.

75.     As set forth in the Cooperation Agreement, BMG was responsible for marketing and sales; Du-Hope was responsible for organizing production and shipments; and Reecon M&E was in charge of product development and manufacturing.

76.     The Cooperation Agreement referenced that BMG owed Du-Hope a total overdue amount of $61,367.10 for shipments to Grainger and Northern Tool in 2014. BMG promised to effect the payment by "_____" (the date was not filled in). Ex. 20.

### I.      Brand's Revised Documents

77.     On September 10, 2015, the Court of Appeals for the Third Circuit affirmed a judgment in favor of BMG in the Intertek lawsuit. *BMG v. Intertek*, 801 F.3d 347 (3d Cir. 2015).

78.     On November 17, 2015, BMG filed notice that the judgment, in the amount of $5,360,200.34, had been fully satisfied. (Civil Action No. 12-1572, ECF No. 314).

79.     Sherman testified that he had an ugly conversation with Brand after the Intertek judgment, in which Brand argued that Fu and Wang should not get their 25% membership interest in BMG because they never signed the papers. Sherman questioned Brand, asking, "but you took the money and took the inventory." Sherman Dep at 39-40.

80.     On July 4, 2016, Brand caused BMG to adopt a Synthetic Stock Plan, without the knowledge or approval of Fu or Wang. Ex. 42. Pursuant to that plan, Brand sent Grant Agreements to Fu and Wang. Ex. 42.

81.     On April 27, 2017, Fu sent an "official request according to the Membership Interest Purchase and Supply Agreement" for financial information. Brand responded that the Membership Agreement was only valid if the equity award was signed, and

14

demanded that Fu execute the stock purchase agreement Brand had drafted. Fu

responded: "I'm not American citizen, I know only the Membership Interest

Purchase Agreement is valid. Just re-confirm again, that the Grant Agreement

doesn't affect any original rights and interests of Wang's and mine." Ex. 40.

82.     Fu and Wang refused to sign the Grant Agreements. The Synthetic Stock Plan

and Grant Agreements never became effective.

## J.     The Civil Actions

83.     On September 6, 2017, Reecon M&E, Fu and Wang sued Brand and BMG

(renamed Reecon NA) in the Allegheny County Court of Common Pleas (the "PA

Action") for breach of the 2013 Membership Agreement by failing to provide their

membership interests and failing to pay for product; conversion and misappropriation

of the judgment in the Intertek lawsuit; and breach of fiduciary duty. The Reecon

Parties sought an accounting and declaratory relief (ECF No. 18-631, ECF No. 1-1).

84.     The complaint was served on the Brand Parties on October 13, 2017.

85.     The Brand Parties filed an answer and new matter on November 21, 2017. (ECF

No. 18-631, ECF No. 1-6).   As their first affirmative defense, the Brand Parties

pleaded that they did not owe Reecon M&E because they purchased the product from

Du-Hope.

86.     Extensive motions practice and discovery occurred in the state court.

87.     The Brand Parties filed a praecipe for a writ to join Du-Hope as an additional

defendant in the PA Action on December 12, 2017. (ECF No. 18-631, ECF No. 1-8).

88.     On January 24, 2018, the Brand Parties filed a motion to discontinue the joinder

of Du-Hope, which was granted over the Reecon Parties' opposition. (ECF No. 18-

631, ECF Nos. 1-13, 1-16).

89.    On April 23, 2018, Reecon M&E, Fu and Wang filed an amended complaint in

the PA Action, which added Du-Hope as a plaintiff with a claim in the alternative in

anticipation of a defense by the Brand Parties.  Specifically, ¶ 50 states, in its entirety:

> "To the extent Defendants take the position that Du-Hope, rather than
> Reecon M&E, is the seller of product to whom Reecon NA is solely
> responsible to pay (which is denied), then in the alternative to the foregoing,
> Du-Hope is nonetheless entitled to the recovery for the breaches set forth in
> Count II above."

90.    Count II alleges breach of the 2013 Membership Agreement (to which Du-Hope

is not a party), and recovery for the unpaid invoices.  (Civil No. 18-631, ECF 1-26).

91.    Upon the filing of the amended complaint in the PA Action, the Brand Parties

filed a Notice of Removal at Civil No. 18-631, arguing that the addition of Du-Hope

as a party created, for the first time, an ability to remove under federal question

jurisdiction pursuant to a treaty, the United Nations Convention on the International

Sale of Goods ("CISG"), available at

https://www.uncitral.org/pdf/english/texts/sales/cisg/V1056997-CISG-e-book.pdf.

(Civil No. 18-631, ECF No. 1).  The Brand Parties argue that the case could not be

removed sooner because Du-Hope is the seller of goods who triggers federal question

jurisdiction under the CISG.  *Id*.  The Brand Parties acknowledge that they cannot

remove the PA Action based on diversity jurisdiction because they are citizens of

Pennsylvania.  *Id*.

92.    On February 23, 2018, BMG (renamed Reecon NA) filed Civil Action No. 18-

234 in federal court, naming Du-Hope and Reecon M&E as defendants.  The Brand

Parties assert subject-matter jurisdiction under both federal question and diversity of

citizenship.

93.    Count 1 of the amended complaint in Civil No. 18-234 (ECF No. 13) asserts

breach of the Cooperation Agreement by Du-Hope.  Count 2 asserts breach of implied

warranty of merchantability against Du-Hope.  Count 3 asserts breach of implied

warranty of fitness for a particular purpose against Du-Hope.   Count 4 asserts breach

of the Membership Agreement by Reecon M&E.  Count 5 asserts breach of an

express warranty set forth in the Membership Agreement by Reecon M&E.  Count 6

asserts breach of implied warranty of merchantability against Reecon M&E.  Count 7

asserts breach of implied warranty of fitness for a particular purpose against Reecon

M&E.  Count 8 asserts tortious interference with contractual and business relations

against both defendants.  Count 9 asserts tortious interference with prospective

business relations against both defendants.  Count 10 asserts negligence by Reecon

M&E.

CONCLUSIONS OF LAW

**A.	Admissibility of Evidence**

1.	The Brand Parties object to: (1) lay opinion testimony regarding the operation of export

agents in China (Bernard Deposition at 15-16; Sherman Deposition at 32-33); (2) third-

party conclusions about the contractual relationships as hearsay (Neumann Deposition at

37; Bernard Deposition at 10-11; Sherman Deposition at 16-17); and (3) the

circumstances of Du-Hope's joinder in the state court action.

2.	The court will exclude the testimony regarding the general operation of export agents in

China as irrelevant.  Federal Rule of Evidence 401.  These cases involve the specific

issues whether (a) Du-Hope was acting as Reecon M&E's export agent in its dealings

with BMG and (b) Brand knew about that relationship; not the broader role of export

agents in China.

3.	The court will admit the testimony about how Brand characterized his contractual

relationship with the Reecon Parties.  One of the key issues in dispute is whether Fu and

Wang became members of BMG. Brand's contemporaneous statements to his sales team are relevant to impeach his testimony in court and at his depositions. The statements at issue are not hearsay because they were made by Brand and are being offered against him by an opposing party. Federal Rule of Evidence 801(d)(2)(A), (C).

4. Even if they did constitute hearsay, the residual exception in Federal Rule of Evidence 807 would apply. Brand had reasonable notice and a fair opportunity to meet this evidence and the witnesses are neutral and best-situated to provide probative testimony on this issue. Fed. R. Evid. 807(a)(1-4), (b).

5. In *Adelman v. Peter*, No. CV L-08-6, 2012 WL 13055150 (S.D. Tex. Feb. 3, 2012) (construing Delaware law), the court held that the conduct of the parties subsequent to signing an LLC agreement could be considered to determine whether a party became a member of an LLC. *Id*. at *5 (citing *Carbine v. Xalapa Farm Ltd. P'ship*, 980 F. Supp. 860, 864 (E.D. La. 1997) (considering extrinsic evidence where it was ambiguous whether execution of other instruments was necessary to transfer partnership interest), and *611 LLC v. U.S. Lubes*, No. CCB-05-3417, 2006 WL 2038615 *5-6 (D. Md. Jul. 18, 2006) (considering post-execution evidence referring to parties as members of LLC)).

6. The court will give the testimony the weight it deserves, recognizing that Neumann, Bernard and Sherman did not review the relevant contractual documents.

7. The court's order specifically precluded the parties from objecting to the other side's proposed findings of fact and conclusions of law. Minute Entry of February 7, 2019. The Brand Parties recognized this prohibition (ECF No 69 at 6) ("Reecon NA is cognizant that this filing is not the place to argue the merits of the Proposed Findings"), but nevertheless presented objections and argument to proposed findings about the state court proceedings. The court denies these objections as improper.

8. The court notes that it can take judicial notice of the docket filings of the state court and this court. *Smierciak v. City of Pittsburgh Police Dep't*, No. 2:18-CV-00734-MJH, 2018 WL 6790312, at *2 n.3 (W.D. Pa. Dec. 26, 2018) (by its very nature, the accuracy and authenticity of the docket cannot reasonably be questioned) (collecting decisions).

9. The Brand Parties' objections (ECF No. 69) are granted in part and denied in part.

## B. Subject-Matter Jurisdiction

### i. General Principles of Subject-Matter Jurisdiction

10. A challenge to the court's subject-matter jurisdiction may be either a facial challenge or factual challenge. A facial challenge concerns an alleged pleading deficiency, whereas a factual challenge "concerns the actual failure of a plaintiff's claims to comport factually with the jurisdictional prerequisites." *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008). In deciding a factual challenge, the court does not accord any presumption of truth to the plaintiff's allegations. *Id.*

11. These cases involve factual challenges to jurisdiction and the parties conducted substantial jurisdictional discovery.

12. In a case initially filed in federal court, the plaintiff bears the burden of proving subject-matter jurisdiction. *Id.*

13. The burden to demonstrate removal jurisdiction rests with the removing party. *Samuel-Bassett v. KIA Motors Am., Inc.*, 357 F.3d 392, 396 (3d Cir. 2004).

14. The removal statutes are strictly construed with all doubts resolved in favor of remand. *Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990).

15. A removing party must establish both: (1) that this court has subject-matter jurisdiction; and (2) that it complied with all statutory removal procedures. *Wright v. Thomas*, No. 1:13-CV-804, 2013 WL 6279203, at *1 (M.D. Pa. Oct. 24, 2013), report and recommendation adopted, No. 1:13-CV-0804, 2013 WL 6281117 (M.D. Pa. Dec. 4,

2013) ("Congress has prescribed both substantive requirements for removal and set time lines and procedures for the exercise of removal jurisdiction"); *see A.S. ex rel. Miller v. SmithKline Beecham Corp.*, 769 F.3d 204, 211 (3d Cir. 2014) (refusing to expand removal statute and noting that removal time limits are intended to prevent the waste of resources involved in restarting a case in a second court after significant proceedings took place in the first court).

16. In both Civil Action Nos. 18-234 and 18-631, the Brand Parties have the burden to demonstrate subject-matter jurisdiction.

### ii. Timeliness of Removal of Civil Action No. 18-631

17. "The notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such [removal] action or proceeding is based." 28 U.S.C. § 1446.

18. The Reecon Parties argue that the removal of Civil Action No. 18-631 was untimely sought. They contend that pursuant to Pennsylvania Rule of Civil Procedure 2252, regardless whether a party is joined by writ or complaint it becomes subject to every claim as if it had been originally named. The Reecon Parties reason that the 30-day removal clock began to run on December 12, 2017, when the Brand Parties filed their writ for joinder of Du-Hope because the Brand Parties previously pleaded in their answer that Du-Hope was the actual seller of the goods and their theory of federal question jurisdiction under the CISG was triggered at that time.

19. Alternatively, because Brand knew that the real contracting party was Reecon M&E (also a Chinese entity), the PA Action arguably could have been removed upon its initial filing under the Brand Parties' theory of CISG jurisdiction.

20. The Brand Parties contend that removal was not proper until Du-Hope filed a claim in the amended state court complaint.

21. Neither party cited federal case law directly on-point to this unusual procedural situation and the court located no decisions addressing the impact of Pennsylvania Rule 2252 on removal to federal court in its independent research.

22. Because the court concludes that it lacks subject-matter jurisdiction, for the reasons set forth below, it does not need to resolve whether the removal was timely sought.

### iii. Removal based on an affirmative defense or counterclaim

23. In Civil Action No. 18-631, the Brand Parties affirmatively represented to the court in their notice of removal that they could not remove the PA Action based on the claims in the original complaint. (Civil No. 18-631, ECF No. 1 ¶ 5) (the Amended Complaint was the first time it could be ascertained that the PA Action was removable).

24. As their first affirmative defense to the original complaint in the PA Action, the Brand Parties pleaded that they did not owe Reecon M&E because they purchased the product from Du-Hope.

25. The parties engaged in procedural sparring over the Brand Parties' writ to join Du-Hope as an additional defendant, which was later withdrawn.

26. In the amended complaint in the PA Action, the Reecon Parties pleaded a one-sentence, alternative theory on behalf of Du-Hope. (Civil No. 18-631, ECF No. 1-26; Finding of Fact 88) ("**To the extent Defendants take the position** that Du-Hope, rather than Reecon M&E, is the seller of product to whom Reecon NA is solely responsible to pay (**which is denied**), then in the alternative to the foregoing, Du-Hope is nonetheless entitled to the recovery for the breaches set forth in Count II above") (emphasis added).

27. The Brand Parties rely solely on this averment as the basis for removal jurisdiction.

28. The averment is in the nature of a preemptive response to the Brand Parties' previously-asserted affirmative defense (which the Reecon Parties denied), and in anticipation of the Brand Parties' counterclaims.[9]

29. Removal is not proper where a federal law theory is only raised as an anticipated defense or counterclaim, rather than on the face of a well-pleaded complaint. As explained in *Loren v. Morgan Stanley*, No. CIVA 06-2132 DRD, 2006 WL 2023180, at *3 (D.N.J. July 18, 2006):

> It has been long held that anticipating a federal defense in a suit asserting a non-federal claim is barred by the well-pleaded complaint rule. *See Rivet v. Regions Bank of La.*, 522 U.S. 470, 475 (1998) (["a case may not be removed to federal court on the basis of a federal defense, ... even if the defense is anticipated in the plaintiff's complaint"]). In *Wiener v. Wampanoag Aquinnah Shellfish Hatchery Corp.*, 223 F.Supp.2d 346, 348 (D. Mass. 2002), the Court addressed a similar issue of whether the federal court was the proper forum to resolve the parties' dispute when the questions of federal law were anticipated in the complaint but not put in issue directly until raised by the defense and counterclaim. That case concerned an action brought against a Native American tribe in state court for injunctive and declaratory relief. The Court held that anticipation of federal claims in the tribe's answer and counterclaims did not present a "well-pleaded complaint," as required to confer federal jurisdiction over [a] claim and permit removal, since vindication of the tribe's rights under state law did not necessarily turn on construction of federal law. *Id.*

30. In *Home Depot U. S. A., Inc. v. Jackson*, No. 17-1471, 2019 WL 2257158, at *4 (U.S. May 28, 2019), the United States Supreme Court recently held that the removal statute does not permit removal based on counterclaims at all, because counterclaims are "irrelevant to whether the district court had original jurisdiction over the civil action." The Supreme Court explained that "original jurisdiction" is defined by the complaint. *Id.*

31. The CISG theory based on sales of goods to Du-Hope was not introduced into the PA Action by the Reecon Parties. As pleaded in the Amended Complaint, the Reecon Parties referred to Du-Hope as a seller of goods only "to the extent [the Brand Parties] take the

---

[9] The Brand Parties did, in fact, file counterclaims against Du-Hope in the PA Action. (Civil No. 18-631, ECF No. 1).

position" as an affirmative defense/counterclaim. The Reecon Parties did not advocate this theory and it is not a necessary basis for their right to relief – to the contrary, the Reecon Parties pleaded that this theory "is denied." *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808 (1988) (federal-question jurisdiction exists only where a well-pleaded complaint establishes either that federal law creates the cause of action or the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law in that federal law is a necessary element of one of the well-pleaded claims).

32. This one-sentence anticipatory averment in the Amended Complaint is arguably not a proper ground for removal, particularly in light of the strict construction that must be given to the removal statute, with all doubts resolved in favor of remand. *Boyer*, 913 F.2d at 111. In any event, as described below, federal question jurisdiction is not present in this situation.

### iv. Federal Question Jurisdiction

33. The Brand Parties assert that both civil actions present a federal question because they implicate the CISG, a treaty which governs contracts for the sale of goods between parties from signatory nations. There is no dispute that there are contracts between United States and Chinese entities, and both nations (the United States and China) are signatories to the CISG. The key question is whether the contracts at issue are for a sale of goods within the scope of the CISG.

34. Courts have universally concluded that the CISG does not apply to distributorship contracts. *Amco Ukrservice v. Am. Meter Co.*, 312 F. Supp.2d 681, 686 (E.D. Pa. 2004) (collecting decisions). In *Amco*, the court held that the CISG did not apply to contracts setting up a relationship to manufacture and install gas meters in Ukraine, and rejected the buyer's argument that it was trying to enforce an obligation to sell goods. *Id*. at 687.

In *Helen Kaminski Pty. Ltd. v. Marketing Australian Products, Inc.*, 1997 WL 414137 (S.D.N.Y. July 23, 1997), the court held that the CISG did not govern the parties' agreement setting the terms for distributing fashion accessories. *Accord Adonia Holding GMBH v. Adonia Organics LLC*, No. 14-1223, 2014 WL 7178389 *3 (D. Ariz. 2014) ("all courts that have considered the question have either held or suggested that the CISG does not govern distributorship agreements, which entail much more than the simple sale of goods").

35. The Membership Agreement and Cooperation Agreement at issue here describe distributorship arrangements held to be outside the scope of the CISG. The Membership Agreement specifically defines BMG as the "distributor" of Reecon M&E's products. Ex. 4 at ¶ 7.1.  Neither agreement identifies specific goods or specific prices and quantities; instead, the agreements set up the framework for the parties' relationship by which Fu and Wang became members of BMG and the parties assigned roles for the supply of heaters to the North American market.

36. The claims in Civil Action Nos. 18-234 and 18-631 allege fundamental breaches of the Membership Agreement and Cooperation Agreements.  The disputes in these cases are not simple buyer-seller disagreements.  Instead, the claims go to the fundamental structure and implementation of the parties' distribution relationship.  *See Amco*, 312 F. Supp.2d at 687 (rejecting "an artificial and untenable distinction between the relationship and supply provisions of a distributorship").

37. The Brand Parties argue that *Amco* and its progeny do not apply when contracts for the sale of goods exist.  (ECF No. 67 at 14-16).  The Brand Parties point to the annual purchase orders and claim for unpaid invoices as the basis for jurisdiction, contending that the "history of discrete sales between the parties distinguishes this case from *Amco* and its progeny."  ECF No. 67 at 14-16.

38. The court disagrees.

39. The fact that goods were ordered and shipped pursuant to a distributorship agreement does not bring that arrangement within the scope of the CISG.  In *Amco*, the court rejected application of the CISG even though product orders were submitted and a shipment of gas meters was on its way to Ukraine.  312 F. Supp.2d at 685.

40. In *Perfumerias Unidas, S.A. v. Coty Prestige Travel Retail & Exp., LLC*, No. 06-CIV-23116, 2007 WL 9709776, at *6 (S.D. Fla. Aug. 7, 2007), the court held:  "I conclude that Perfumerias' allegation that it placed, and Coty filed, a specific order for the sale of goods in August 2006 and/or other orders which were fulfilled does not bring the underlying alleged April 23, 2006 distribution agreement within the scope of the CISG."

41. The *Perfumerias* decision relied on *Amco* and explained:

> The court in *Amco-Ukrservice* faced a similar set of facts to the ones presented here-including the existence of individual orders for goods placed pursuant to the underlying distribution agreement and that court concluded that the distribution agreement did not fall within the scope of the CISG. Likewise, the court in *Multi-Juice* [*Multi-Juice, S.A. v. Snapple Beverage Corp.*, 2006 WL 1519981 (S.D.N.Y. June 1, 2006)] concluded that the delivery of individual shipments of goods did not bring the framework distributor agreement within the scope of CISG.

*Id*. at *5; *accord Adonia,* 2014 WL 7178389 at *3 (rejecting application of CISG even though the distributorship agreement involved purchases of goods).[10]

42. Perhaps the most factually analogous case is *Viva Vino Import Corp. v. Farnese Vini S.r.l.,* No. 99–6384, 2000 WL 1224903, at *1–2 (E.D. Pa. Aug. 29, 2000), in which the court held that the CISG did not govern an exclusive distributorship agreement, an agreement granting the plaintiff a 25% interest in the defendant company, or a sales commission agreement because none of the contracts were for a sale of particular goods

---

[10] None of these decisions supports Brand's creative effort to invoke the CISG by the backdoor, by alleging breaches of individual purchase orders and asserting supplemental jurisdiction over the more fundamental breaches of the distribution arrangement or the transfer of membership interests in the limited liability company.  (*See* ECF No. 67 at 19).

or had specific price and quantity terms. In its analysis, the court noted that wine was shipped F.O.B. Italy under the arrangement. *Id*. at *2.

43. The decisions cited by the Brand Parties are readily distinguishable. *Roser Techs., Inc. v. Carl Schreiber GmbH*, No. 11CV302, 2013 WL 4852314, at *1 (W.D. Pa. Sept. 10, 2013), involved a straight-forward order for the manufacture and sale of copper mold plates and subject-matter jurisdiction was not in dispute. *See Shantou Real Lingerie Mfg. Co. v. Native Grp. Int'l, Ltd*., No. 14CV10246-FM, 2016 WL 4532911, at *1 (S.D.N.Y. Aug. 23, 2016) (same); *Zhejiang Shaoxing Yongli Printing & Dyeing Co. v. Microflock Textile Grp. Corp*., No. 0622608CV-O'SULLIVAN, 2008 WL 2098062, at *1 (S.D. Fla. May 19, 2008), amended, No. 0622608CIVOSULLIVAN, 2008 WL 11333554 (S.D. Fla. July 23, 2008) (same). *Gruppo Essenziero Italiano, S.p.A. v. Aromi D'Italia, Inc*., No. CIV. CCB-08-65, 2011 WL 3207555, at *1 (D. Md. July 27, 2011), did involve an exclusive distributor agreement, but the only disputes at issue involved non-payment of invoices and subject-matter jurisdiction was not disputed. By stark contrast, the disputes in this case involve the fundamental relationships among the parties.

44. The Brand Parties' proposed findings cite ¶¶ 206-229 of the Amended Complaint in Civil No. 18-234 as the basis for federal question jurisdiction (*see* ECF No. 67 at 19). Those paragraphs relate to the tortious interference claims.

45. The CISG does not apply to tort claims, including claims of tortious interference with business relations. *Viva Vino,* 2000 WL 1224903, at *1. Federal question jurisdiction cannot be based on counts 8, 9 or 10 of the Amended Complaint in Civil No. 18-234.

46. The CISG does not apply to distributorship arrangements, even where products were exchanged.

47. The court does not have federal question jurisdiction over Civil Action No. 18-234 or Civil Action No. 18-631.

**v.      Diversity of Citizenship Jurisdiction**

48. Civil Action No. 18-631 cannot be removed on the basis of diversity of citizenship

    because the removing parties are citizens of Pennsylvania.  28 U.S.C. § 1441(b)(2).

49. Jurisdiction for Civil Action No. 18-234 purports to be proper under 28 U.S.C. § 1332,

    which requires complete diversity of citizenship.

50. Citizenship of a LLC is determined by the citizenship of each of its members.  *Zambelli*

    *Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 420 (3d Cir. 2010).

51. Diversity jurisdiction in Civil Action No. 18-234 depends upon whether Fu and Wang

    became members of BMG.  If so, a plaintiff and defendant would both be Chinese

    citizens.

52. Because the Brand Parties' attorney drafted the  Membership Agreement and Operating

    Agreement, Brand Deposition at 18, any ambiguities are construed against the Brand

    Parties.  *Twin City Fire Ins. Co. v. Delaware Racing Ass'n*, 840 A.2d 624, 630 (Del.

    2003).

53. The Membership Agreement is to be construed under Delaware law.  Ex. 4 ¶ 9.1.

54. The basic policy of the Delaware LLC Act is to provide members with freedom of

    contract and broad discretion in drafting an LLC agreement and to furnish default

    provisions when the members' agreement is silent.  *Elf Atochem N. Am., Inc. v. Jaffari*,

    727 A.2d 286, 291 (Del. 1999).

55. Delaware law defines a "Limited liability company agreement" as "any agreement

    (whether referred to as a limited liability company agreement, operating agreement or

    otherwise), **written, oral or implied**, of the member or members as to the affairs of a

    limited liability company and the conduct of its business."  6 Del. C. § 18-101(7).

56. A member is bound by the limited liability company agreement whether or not the member executes the limited liability company agreement. *Id.* A limited liability company is not required to execute its limited liability company agreement. *Id.*

57. A limited liability company agreement may provide rights to any person, including a person who is not a party to the limited liability company agreement, to the extent set forth therein. *Id.*

58. A written limited liability company agreement or another written agreement or writing:

  a. May provide that a person shall be admitted as a member of a limited liability company, or shall become an assignee of a limited liability company interest or other rights or powers of a member to the extent assigned:
    1. If such person (or a representative authorized by such person orally, in writing or by other action such as payment for a limited liability company interest) executes the limited liability company agreement **or any other writing evidencing the intent of such person to become a member** or assignee; or
    2. **Without such execution, if such person** (or a representative authorized by such person orally, in writing or by other action such as payment for a limited liability company interest) **complies with the conditions for becoming a member or assignee as set forth in the limited liability company agreement or any other writing**; and

  b. **Shall not be unenforceable by reason of its not having been signed** by a person being admitted as a member or becoming an assignee as provided in paragraph (7)a. of this section, or by reason of its having been signed by a representative as provided in this chapter.

*Id*. (emphasis added).

59. Delaware law defines the term "Member" as "a person who is admitted to a limited liability company as a member as provided in § 18-301 of this title." 6 Del. C. § 18-101(11).

60. Under 6 Delaware Code § 18-301(b)(1), after the initial formation of a LLC, a person who is not an assignee is admitted as a member of an LLC as follows:

  (1) In the case of a person who is not an assignee of a limited liability company interest, including a person acquiring a limited liability company interest directly from the limited liability company and a person to be admitted as a member of the limited liability company without acquiring a limited liability company interest in

the limited liability company **at the time provided in and upon compliance with the limited liability company agreement** or, if the limited liability company agreement does not so provide, upon the consent of all members and when the person's admission is reflected in the records of the limited liability company.

61. In *Adelman*, 2012 WL 13055150, at *5 (addressing a similar membership dispute under Delaware law), the court explained:

> Under the Delaware LLC statute, an operating agreement, sometimes known as a limited liability company agreement, is an agreement "of the member or members as to the affairs of a limited liability company and the conduct of its business." Del. C. Ann. tit. 6, § 18-101(7). Operating agreements "[m]ay provide that a person shall be admitted as a member of a limited liability company ... [i]f such person ... executes the ... agreement." tit. 6 § 18-101 (7)(a)(1). It is the policy of Delaware to give "maximum effect ... to the enforceability of limited liability company agreements." tit. 6 § 18-1101(b); *see also Achaian, Inc. v. Leemon Family LLC*, 25 A.3d 800, 803-805 (Del. Ch. 2011) (discussing Delaware LLC policy). Accordingly, the Delaware Supreme Court has noted that such agreements effectively constitute the entire agreement among existing members with respect to the admission of new members to the limited liability company.

62. In *611 LLC*, 2006 WL 2038615, the court faced the same task confronting this court, namely, determining whether parties became members of a Delaware LLC for purposes of removal and diversity jurisdiction. The court first reviewed the important legal principles, including the burden on the removing party, the federalism concerns implicated by removal jurisdiction, the need to construe strictly the removal statute and the duty to remand cases where federal jurisdiction is in doubt. *Id*. at *2. The court closely scrutinized the terms of the parties' agreements and considered extrinsic evidence to determine whether a membership interest, rather than a mere assignment of financial interests, was transferred. The court concluded that even though the new member failed to seek formal confirmation of its status, it advanced a reasonable basis for membership in the LLC. The court rejected defendants' inconsistent, if not inequitable, position to the contrary, "[e]specially considering the defendants' burden of demonstrating subject matter jurisdiction" and remanded the case to the state court. *Id*. at *6.

29

63. Brand formed BMG under Delaware law on November 15, 2004, with himself as the sole member. Ex. 12. The initial LLC Agreement §§ 6,8 authorized BMG to issue a single class of membership interests and anticipated there could be multiple members. *Id.*[11]

64. The Membership Agreement is a writing evidencing the intent for Fu and Wang to become members of BMG. 6 Del. C. § 18-101(7).

65. The Membership Agreement provided that Fu and Wang would each receive a 12.5% membership interest in BMG. Fu and Wang were not mere assignees of a financial interest.

66. Fu and Wang satisfied all the preconditions to closure of the Membership Agreement that were within their control by paying the cash price and causing the product investment to be made. Ex. 4, 9. The Brand Parties failed to meet their burden to demonstrate that Reecon M&E did not satisfy the Product Investment condition because the products were defective.

67. It was not essential that the Amended Operating Agreement be executed because Fu and Wang complied with all their preconditions for becoming members of BMG. 6 Del. C. § 18-101(7)(a)(2).

68. The Membership Agreement § 1.1(a) imposed the duty to adopt the Amended Operating Agreement on BMG.

69. Brand treated Fu and Wang as members of BMG after execution of the Membership Agreement.

70. The court rejects the Brand Parties' theory that the investment made by Fu and Wang was merely "consideration for the right to become members upon certain conditions precedent

---

[11] Section 11 of the LLC Agreement authorized a member to assign "all or any part of its interest at any time" with the tranferree becoming a substituted member "automatically." In *Achaian, Inc. v. Leemon Family LLC*, 25 A.3d 800, 807 (Del. Ch. 2011), the court construed a similar provision ("Member may transfer all or any portion of its interest in [Omniglow] to any Person at any time") as providing for a transfer of a member's entire ownership interest, including voting rights, rather than a mere assignment of the member's economic interest in the LLC.

being met." ECF No. 67 at 44. *See* ECF No. 67 at 22 ("it was an agreement that Mr. Fu and Mr. Wang's percentage interest, if any vested, would be determined at a later time.") It is wholly unreasonable to believe that Fu and Wang agreed to invest or cause to be invested over $185,000 in cash and product while the Brand Parties retained an unrestricted option to decide whether or not to give them any membership interest at all.

71. Brand argues that because Fu and Wang signed the Membership Agreement without an executed Amended Operating Agreement, their "percentage interest" in Section 1.1(b) became "undefined." ECF 67 at 22. The Brand Parties reason that the parties never reached a meeting of the minds on their percentage interest, and therefore Fu and Wang received nothing. The court rejects this argument as frivolous. The negotiations, the text of the Membership Agreement, and the execution version of the Amended Operating Agreement clearly specify that Fu and Wang would each receive a 12.5% membership interest.

72. The court rejects the Brand Parties' theory that Fu and Wang did not want to finalize the agreement because they wanted to avoid tax consequences. ECF No. 67 at 44. The plain text of the Membership Agreement, which Fu and Wang executed, provided each of them with 12.5% interest in the company. Fu and Wang fulfilled all the conditions to membership within their control.

73. It was Brand's responsibility, as the majority owner and sole manager of BMG, to cause the Amended Operating Agreement to be finalized. Ex. 4 § 1.1(a). Fu and Wang had no ability to do so.

74. Brand did not consider the Amended Operating Agreement to be an essential part of the Membership Agreement because he did not attach it to the "complete version" of the Membership Agreement he emailed on February 22, 2013 (Ex. 4).

75. The Amended Operating Agreement independently demonstrates the intent for Fu and Wang to become members of BMG.

76. The "Execution Version" of the Amended Operating Agreement emailed by Brand to Fu and Wang on January 22, 2013, recited that it was being amended "[i]n connection with the admission of 2 new individuals to the Company as Members on the date hereof." Ex. 13. Annex A identified Fu and Wang as the new members. Ex. 13.

77. The language of the initial BMG LLC Agreement provided that additional membership interests could be issued by BMG or Brand could transfer some of his membership interests, which was to occur "automatically."[12]

78. Fu's and Wang's signatures on the Amended Operating Agreement were not necessary to effectuate membership. The introductory paragraph of the Amended Operating Agreement stated that it shall be binding on the members "regardless of whether or not the Person has executed this Agreement or any amendment thereto." Ex. 13.

79. Under Delaware law, an LLC operating agreement: "Shall not be unenforceable by reason of its not having been signed by a person being admitted as a member." 6 Del. C. § 18-101(7)(b). An operating agreement need not even be in writing. *Id.*

80. In *Adelman*, the court concluded an operating agreement which listed the members and their percent interests, standing alone, established that they were members of the LLC. 2012 WL 13055150 at * 5.

81. The Brand Parties advance several arguments why Fu and Wang never became members under the Membership Agreement: (1) there was no closing; (2) there was no finalized Amended Operating Agreement; (3) they never satisfied the product precondition

---

[12] *Compare, e.g.,* the original LLC Agreement with the Execution Version of the restated Operating Agreement sent to Fu and Wang on January 22, 2013 (Ex. 13 Art. X) (setting forth procedures for future transfers of membership interests).

because the goods were defective; and (4) they did not act like owners. None of these arguments is convincing.

82. Neither Brand nor BMG ever invoked § 8.2(b) of the Membership Agreement, which authorized BMG to terminate the Agreement if the conditions precedent were not met or the closing did not occur by December 31, 2013. *See* Ex. 4 § 8.2.

    a. The Closing

83. The Membership Agreement provided that the closing would take place remotely within 10 business days following satisfaction of the conditions, or such other time and place as mutually agreed. Ex. 4 § 2.1.

84. Brand acknowledged Fu's and Wang's membership interests in BMG to numerous persons, including Sherman, Neumann, Bernard, and the United States consulate (Ex. 16).

85. Brand and BMG ratified the closing of the Membership Agreement by changing the company's name from BMG to Reecon NA and submitting the product investment worksheet showing that Reecon M&E contributed $17,518 more in product than required (Ex. 9). *See Fidanque v. Am. Maracaibo Co.*, 33 Del. Ch. 262, 280 (1952) ("stockholder ratification of the agreement for the exchange of stock cured any defect which may have existed in this transaction. It is therefore a legal and binding agreement.")

86. Brand and BMG recognized the closing of the Membership Agreement by entering into the Cooperation Agreement (Ex. 20) to formalize a supply arrangement pursuant to § 7.1 of the Membership Agreement, which provided that the supply arrangement would be negotiated "[f]ollowing the closing date." Ex. 4.

87. Prior to July 2016, neither Brand nor BMG ever notified Fu or Wang that the Membership Agreement was not in force.

88. In sum, the lack of a formalized closing did not prevent Fu and Wang from becoming

members of the LLC.

        b. The Amended Operating Agreement

89. The court explained above why the Amended Operating Agreement is sufficient to

recognize Fu's and Wang's membership interests in BMG under Delaware law even

though it was not signed.

90. Brand and BMG are also estopped from arguing that the Amended Operating Agreement

never became effective because Fu and Wang did not execute it.

91. The Pennsylvania Supreme Court explained the doctrine of promissory estoppel in

*Crouse v. Cyclops Industries*, 745 A.2d 606, 610 (2000), as follows:

> In order to maintain an action in promissory estoppel, the aggrieved party must
> show that 1) the promisor made a promise that he should have reasonably
> expected to induce action or forbearance on the part of the promisee; 2) the
> promisee actually took action or refrained from taking action in reliance on the
> promise; and 3) injustice can be avoided only by enforcing the promise. *Id*. As
> promissory estoppel is invoked in order to avoid injustice, it permits an
> equitable remedy to a contract dispute.

92. Brand made a specific promise when he instructed Fu and Want to not execute the

Amended Operating Agreement in the January 22, 2013 email, stating: "The attached

operating agreement is just for your reference and NOT to be signed at this time. We will

sign and file this after the final transaction of goods." Ex. 13. In response to questions

from Fu, Brand explained: "The operating agreement will come later after the transaction

is complete. The operating agreement is between the company and the state of

Delaware." Ex. 2.

93. Brand's promise was reasonably expected to induce forbearance by Fu and Wang; and

they refrained from signing the Amended Operating Agreement in reliance on Brand's

promise. Brand broke his promise by not executing the Amended Operating Agreement

on behalf of BMG when Fu and Wang satisfied all the preconditions to membership set

forth in the Membership Agreement; and injustice can be avoided only by enforcing the promise, i.e., by regarding the Amended Operating Agreement as executed.

94. Brand and BMG cannot rely on the lack of Fu's and Wang's signatures to defeat their membership interests, when Brand, the sole manager of BMG, specifically instructed them not to sign it. *Apalucci v. Agora Syndicate, Inc.*, 145 F.3d 630, 634 (3d Cir. 1998) ("As a general rule, when one party to a contract unilaterally prevents the performance of a condition upon which his own liability depends, the culpable party may not then capitalize on that failure").

c. The Product Contribution

95. The court found, as a factual matter, that sufficient product was contributed to satisfy this precondition to membership.

96. Even under Brand Parties' theory of the case, Fu and Wang caused the product investment to be completed, albeit not until 2016 with a shipment of displays for Lowe's. Tr. 66-67.

97. As explained above, the Brand Parties failed to meet their burden to prove by a preponderance of the evidence that this precondition was not fulfilled because the products were defective. Brand prepared his Product Investment Worksheet on July 5, 2015 (Ex. 9), long after he was aware of the problems with Stoll. The Product Investment Worksheet contains no reduction or offset for allegedly defective products.

98. The Brand Parties argue that the $61,367.10 payment referenced in the Cooperation Agreement means that the initial Product Investment was not satisfied. The court rejects this argument. The Cooperation Agreement contains no language with respect to a failure to meet the initial Product Investment. By executing the Cooperation Agreement, BMG agreed that payment for those shipments was overdue.

99. It is not reasonable to conclude that the 2013 Membership Agreement failed for lack of consideration due to product problems that arose years later.

### d. Acting as Owners

100.    As a final argument, the Brand Parties argue that Fu and Wang did not act as owners because they did not pay taxes, contribute their personal funds to BMG, etc.

101.    Fu's and Wang's actions were consistent with their position as minority members of the LLC and their agreement with Brand.

102.    It was not surprising that Fu and Wang did not seek profit distributions or pay taxes. In the initial negotiations, Brand "agreed to keep the profit and pay 100% of the tax each year going forward." Ex. 2.

103.    Brand had full control over the operations and preparation of financial documents for BMG.

104.    When an issue implicating their membership rights arose, Fu and Wang asserted their rights under the Membership Agreement and rejected Brand's attempt to have them accept a Synthetic Stock Agreement and Grant Agreements.

### e. Duty of good faith and fair dealing

105.    Under Delaware law, every contract has an implied duty of good faith and fair dealing. In *Price v. State Farm Mut. Auto. Ins. Co*., No. CIV.A. N11C-07069RRC, 2013 WL 1213292, at *13 (Del. Super. Ct. Mar. 15, 2013), aff'd, 77 A.3d 272 (Del. 2013), the court explained:

> The implied duty of good faith and fair dealing attaches to every Delaware contract, including insurance contracts. The duty of good faith and fair dealing has been defined as "the obligation to preserve the spirit of the bargain rather than the letter, the adherence to substance rather than form.

106.    Delaware's LLC law imposes a specific duty of good faith on members and managers of LLCs: "To the extent that, at law or in equity, a member or manager or

other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing." 6 Del. C. § 18-1101(c).

107. Neither Brand nor BMG acted in good faith or dealt fairly with Fu and Wang. To the contrary, BMG through its sole manager, Brand, accepted their cash and the product contributions, changed BMG's name to take advantage of the Reecon brand, and held Fu and Wang out as members for several years. It was not until after the substantial Intertek judgment that Brand and BMG attempted to disavow Fu's and Wang's membership interests.

108. Under principles of equity, BMG and Brand are estopped from arguing that Fu and Wang were not members of BMG.

f. Summary of conclusions with respect to diversity jurisdiction

109. Fu and Wang, Chinese citizens, are members of BMG.

110. BMG (now named Reecon North America, LLC) is considered to be a citizen of Pennsylvania and China.

111. Because plaintiff and defendants are citizens of China, this court lacks diversity of citizenship jurisdiction over Civil No. 18-234.

**C.      Request for Costs and Counsel Fees**

112. The Reecon Parties seek an award of the costs and expenses, including counsel fees, they incurred as a result of the improper removal pursuant to 28 U.S.C. § 1447(c).

113.     Section 1447(c) provides, in relevant part:  "An order remanding the case may

require payment of just costs and any actual expenses, including attorney fees, incurred

as a result of the removal.  28 U.S.C. § 1447(c).

114.     The Supreme Court explained that "an award of fees under § 1447(c) is left to the

district court's discretion, with no heavy congressional thumb on either side of the

scales." *Martin v. Franklin Capital Corp*., 546 U.S. 132, 139 (2005).  "The appropriate

test for awarding fees under § 1447(c) should recognize the desire to deter removals

sought for the purpose of prolonging litigation and imposing costs on the opposing party,

while not undermining Congress' basic decision to afford defendants a right to remove as

a general matter, when the statutory criteria are satisfied." *Id*. at 140.

115.     "Absent unusual circumstances, courts may award attorney's fees under § 1447(c)

only where the removing party lacked an objectively reasonable basis for seeking

removal. Conversely, when an objectively reasonable basis exists, fees should be

denied." *Id.*

116.     In *611, LLC*, the court rejected a similar request for costs and fees because the

motion to remand raised a novel and complex question and there was no evidence of bad

faith in the removal.  2006 WL 2038615 at *6 n.14 (citing *Nat'l Ass'n of State Farm

Agents*, 201 F.Supp.2d at 531 n. 12).

117.     This case presents a close question for the award of fees under § 1447(c).  The

Brand Parties presented an objectively reasonable basis for seeking removal, given the

paperwork in Du-Hope's name as the export agent and the CISG theory asserted, albeit

an erroneous theory.

118.     After reflection, the court exercises its discretion to decline to impose fees under §

1447(c).

119.    Pursuant to § 9.10 of the Membership Agreement, the prevailing party is entitled

to recover all fees, costs and expenses, including counsel fees.  Because the instant

decision concerns jurisdiction, rather than the merits, the court does not decide whether

the Reecon Parties are entitled to recover under this provision.


Conclusion

In accordance with the foregoing, Civil Action No. 18-631 will be REMANDED

forthwith to the state court forthwith and Civil Action No. 18-234 will be DISMISSED for lack

of subject-matter jurisdiction.

An appropriate order follows.




June 20, 2019.


/s/ Joy Flowers Conti
Joy Flowers Conti
Senior United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **REECON NORTH AMERICA, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **2:18-CV-00234-JFC** |
| vs. | ) | |
| | ) | |
| **DU-HOPE INTERNATIONAL GROUP,** | ) | |
| **REECON M & E CO. LTD.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

| | | |
|---|---|---|
| **REECON M & E CO. LTD., GUOHONG** | ) | |
| **FU, YAODANG WANG, and DU-HOPE** | ) | |
| **INTERNATIONAL GROUP,** | ) | **2:18-CV-00631-JFC** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **REECON NORTH AMERICA, LLC, and** | ) | |
| **DAVID BRAND,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER OF COURT

And now this 20th day of June, 2019, in accordance with the foregoing Findings of Fact

and Conclusions of Law, Civil Action No. 18-631 is REMANDED to the state court

FORTHWITH and Civil Action No. 18-234 is DISMISSED for lack of subject-matter

jurisdiction and marked closed.


/s/ Joy Flowers Conti
Joy Flowers Conti
Senior United States District Judge